NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                                :
PEREZ, et al.,                                  :
                                                :
                              Plaintiffs,       :        Civil No. 12-7687 (RBK/KMW)
                                                :
                    v.                          :        **OPINION**
                                                :
                                                :
CITY OF CAMDEN, et al.,                         :
                                                :
                              Defendants.       :
_____         :

**KUGLER**, United States District Judge:

This case arises out of the arrests of Plaintiffs, Mario Perez ("Mario"), Mariano Perez ("Mariano"),[1] Misael Perez ("Misael") and Isack Perez ("Isack") (collectively, "Plaintiffs"), by four City of Camden Police Officers, Officer Michael Heller ("Heller"), Officer William Roberts ("Roberts"), Officer Nicholas Rao ("Rao") and Officer James Chiariello ("Chiariello") (collectively, "the Officers"), in the City of Camden, New Jersey, on December 25, 2010.

Plaintiffs bring federal and state claims, for use of excessive force, against Heller, Roberts, Rao, Chiariello, the City of Camden ("Camden City") (collectively, "Defendants"), and numerous other named fictitious individuals.

---

[1] There are two Plaintiffs named Mariano Perez. "Mario" will be used to refer to the elder Mariano Perez (dob 2/22/1957), and "Mariano" will be used to refer to his son, the younger Mariano Perez (dob 11/15/1977).

Currently before the Court are Defendants' motions for summary judgment.  (Doc. Nos. 17-21.)[2]  For the reasons that follow, Defendants' motions will be denied.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

On the evening of Christmas Day, December 25, 2010, Heller stopped a motor vehicle driven by Isack on the corner of 28th and Mitchell Streets in Camden, New Jersey.  (Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶¶ 4-6; Pls.' Response to Defs.' SMF ("Pls.' Response") ¶¶ 4-6.)[4]  After requesting Isack's credentials, Heller returned to his patrol vehicle.  (Defs.' SMF ¶¶ 7-8.)  Shortly thereafter, Roberts, Rao and Chiariello arrived as backup.  (Id. ¶ 9.)  While Heller was in his vehicle, Mariano and Misael emerged from the surrounding apartments.  (Id. ¶ 10.)  Mariano approached Isack's vehicle and Heller instructed Mariano to step away from Isack's vehicle.  (Id. ¶¶ 10-11.)

Next, Heller and Roberts allegedly observed some unknown object being passed either from Isack to Mariano outside the car or from Mariano to Isack inside the car.  (Compare Ex. B to Defs.' Br. in Supp. of Summ. J. o/b/o Camden City, Heller, Rao and Chiariello ("Defs.' Br."), Deposition Testimony of Officer Michael Heller ("Heller Dep.") 16:22-18:13 (indicating that the

---

[2] Defendant Roberts filed four motions for summary judgment against the individual Plaintiffs, separate from Defendants Camden City, Heller, Rao and Chiariello.  Due to the similarity of Roberts' claims and the material facts he asserts, his motions will be addressed alongside those of the other defendants.  References to "Defs.' SMF," and "Defs.' Br.," and the exhibits therein, will be applicable to Roberts unless otherwise noted with a specific reference to his moving papers, i.e., Roberts Br. in Supp. of Summ. J. agst. Mariano Perez ("Roberts Br. re: Mariano"), Roberts Br. in Supp. of Summ. J. agst. Mariano (a/k/a Mario) Perez ("Roberts Br. re: Mario"), Roberts Br. in Supp. of Summ. J. agst. Isack Perez ("Roberts Br. re: Isack"), and Roberts Br. in Supp. of Summ. J. agst. Misael Perez ("Roberts Br. re: Misael").

[3] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

[4] Hereinafter, unless otherwise noted, all citations to Defs.' SMF incorporate a reference to the corresponding identical paragraph number and admission to that fact found in Pls.' Response.

object being passed could have been going into or out of the car); Ex. H to Defs.' Br., Deposition

Testimony of Officer William Roberts ("Roberts Dep.") 14:1-15 (noting that he was unable to

describe the object passing "back and forth" inside and outside the car), <u>with</u> Ex. A to Defs.' Br.,

Incident Rep. 1 ("[Roberts and Heller] attempted to speak with [Mariano] and advise him to step

away from the vehicle multiple times as [someone in the vehicle was] passing objects from the

car to [Mariano]").)  After observing this exchange, Heller developed a suspicion that Isack and

Mariano were engaged in illegal activity.  (Defs.' SMF ¶ 13.)

　　　　According to Defendants, Mariano then moved away from the vehicle and threw an

object to the ground.  (Ex. A to Defs.' Br., Incident Rep. 1; Ex. B to Defs.' Br., Heller Dep. 19:9-

15.)  Heller followed Mariano as he began walking toward one of the surrounding apartments

and instructed Mariano to stop.  (Ex. A to Defs.' Br., Incident Rep. 1; Ex. B to Defs.' Br., Heller

Dep. 20:1-21:12.)  Mariano did not stop, and instead attempted to enter the apartment of Gabriel

Perez.  (Defs.' SMF ¶ 16.)  Near the entrance of the apartment, Heller attempted to grab Mariano

and arrest him, but he was unable to do so and Mariano entered the apartment.  (Ex. A to Defs.'

Br., Incident Report 1-2; Ex. B to Defs.' Br., Heller Dep. 24:2-24.)

　　　　Several other members of the Perez family, including Misael and Mario were standing in

the doorway as Mariano entered the house.  (Defs.' SMF ¶ 19.)  Defendants allege that these

individuals prevented Heller from entering the apartment after Mariano, and instead pushed him

away from the doorway of the apartment.  (Ex. A to Defs.' Br., Incident Report 2; Ex. B to

Defs.' Br., Heller Dep. 27:11-16.)  After Heller was unable to enter, a large number of

individuals came out of the apartment, at which point Heller radioed for additional backup.  (Ex. A to Defs.' Br., Incident Report 2; Ex. B to Defs.' Br., Heller Dep. 28:22-30:19.)

A struggle ensued, which Defendants claim began when Heller and Rao attempted to arrest one of the Plaintiffs who was pushing and punching at them.  (Ex. A to Defs.' Br., Incident Report 2) (identifying Misael as the first individual assaulting Heller and Rao and physically resisting arrest); Ex. B to Defs.' Br., Heller Dep. 30:20-31:13.)  Misael attempted to strike Heller in the face, and while the Officers were attempting to place Misael under arrest, his father Mario attempted to grab the arresting officers.  (Ex. A to Defs.' Br., Incident Report 2.)  Both Misael and Mario were forcefully brought to the ground and, after a struggle, each was placed under arrest.  (Id.)

While the Officers were dealing with Misael and Mario, Mariano exited the apartment and assumed a "fighting stance" once he saw the Officers struggling with his family.  (Id.)  Mariano attempted to force himself past the Officers to assist Misael and Mario, after which he was pushed back and to the ground, and then placed under arrest.  (Id.)  At some point Isack also attempted to push past the Officers and took a "fighting stance" with Heller and Rao.  (Id.)  Isack struck Rao in the face multiple times before being brought to the ground and eventually being placed under arrest.  (Id.)

During the fracas several men and women were yelling and screaming in an attempt to interfere with the Officers who were trying to place the Plaintiffs into custody.  (Id.)  Heller, trying at one point to disperse the crowd, attempted to use his OC Pepper Spray to fend off the interveners.  (Id.)  As the altercation escalated, Roberts radioed a "code 1033," which is the code that calls for all available units to assist officers in trouble.  (Defs.' SMF ¶ 30.)  In response to

this radio call, all officers in the vicinity reported to the scene and assisted the Officers in pacifying the situation.  (Id.)

     As a result of the events, Isack, Misael, Mario, Mariano, and Gabriel Perez were arrested. (Id. ¶ 32.)  Each plaintiff was charged with aggravated assault (N.J.S.A. 2C:12-1B(5)(A)), rioting (N.J.S.A. 2C:33-1A(2)), and resisting arrest (N.J.S.A. 2C:29-2A(3)(A)).  (Id. ¶ 42.)

     Understandably, Plaintiffs have a different recollection of several of the material facts.

     According to Plaintiffs, while Heller was checking the credentials of Isack during the original motor vehicle stop, Mariano approached to only within five feet of Isack's car and asked Heller for permission to get cigarettes from the car.  (Ex. A to Pls.' Opp'n Br., Deposition Testimony of Mariano (son) Perez ("Mariano Dep.") 18:6-14.)  Isack then threw the pack of cigarettes out as Heller was walking towards his car.  Mariano picked the cigarettes up off the ground, held them in the air, and told Heller, "Look it's just a pack of cigarettes," after which Heller said, "Get inside the house."  (Id. 19:5-11.)  At this point none of the Officers had instructed Mariano not to go into the house.  (Id. 21:2-18.)

     After Mariano had entered the home of Gabriel Perez, the Officers approached the apartment and instructed Mariano to come back outside.  (Id. 22:12-23:4.)  Misael and Mario were standing in the doorway at that time.  (Id. 23:5-12).  While Misael was standing in the doorway to the apartment, one of the Officers approached and Misael asked him why he was trying to enter the apartment.  Two more Defendants appeared next to Misael and suddenly he was hit with a closed fist to the face.  (Ex. G to Defs.' Br., Deposition Testimony of Misael Perez ("Misael Dep.") 27-28.)  At that point the Officers "just shrugged [Mario] and [Misael] out the

door and started beating the crap out of them."  (Ex. A to Pls.' Opp'n Br., Mariano Dep. 24:16-21.)

      With respect to Misael, Rao used compliance holds, strikes with his hands or fists to the face of Misael, and strikes with his flashlight.  (Ex. E to Pls.' Opp'n Br., Officer Rao Use of Force Report ("Rao UOFR"); Ex. I to Pls.' Opp'n Br., Deposition Testimony of Office Nicholas Rao ("Rao Dep.") 39-40.)  Chiariello and Roberts also both used compliance holds with Misael, as well as using strikes with their hands or fists, and Chiariello pushed Misael to the ground. (Ex. H to Pls.' Opp'n Br., Officer Chiariello Use of Force Report ("Chiariello UOFR"); Ex. G to Pls.' Opp'n Br., Officer Roberts Use of Force Report ("Roberts UOFR").)  Both Chiariello and Roberts brought Misael to the ground and handcuffed him.  (Ex. H to Pls.' Opp'n Br., Chiariello UOFR; Ex. H to Defs.' BR., Deposition Testimony of Officer William Roberts ("Roberts Dep.") 18:20-23, 20:8-10.)

      After being searched and patted down, Mario complied when he was told to get on the ground.  (Ex. I to Defs.' Br., Deposition Testimony of Mariano (father) Perez ("Mario Dep.") 29:4-9.)  However, he was then pushed forcibly to the ground by one of the Officers using his feet.  (Id. 29:10-12.)  Though he complied when he was told to put his hands behind his back, one of the Officers took Mario's hand and put it all the way up his back, dislocating his shoulder. (Id. 29:19-22.)  While he was handcuffed and still on the ground Mario was kicked by multiple Defendants.  (Id. 30:11-31:3.)  Roberts used a compliance hold as well as his hands or fists on Mario, (Ex. G to Pls.' Opp'n Br., Roberts UOFR), and Chiariello pushed Mario to the ground to keep him from getting up.  (Ex. H to Pls.' Opp'n Br., Chiariello UOFR.)  Chiariello also assisted Roberts with the handcuffing of Mario.  (Ex. D to Defs.' Br., Deposition Testimony of Officer

James Chiariello ("Chiariello Dep.") 21-22; Ex. H to Defs.' Br., Roberts Dep. 18:20-23, 20:8-10.)

Meanwhile, Mariano was rushed from behind, picked up, and slammed to the ground by one of the Officers, after which he was kicked and punched. ("Ex. A to Pls.' Opp'n Br., Mariano Dep. 28:10-17.) Despite not knowing the exact identity of the Officer that picked him up and brought him to the ground, Mariano remembers both Rao and Heller being involved, and that Heller punched him during the altercation. (Id. 28:22-29:9.) Though he was already in handcuffs in the ground, the Officers continued to punch and kick him, (id. 29:13-14), the result of which was a black eye, a busted lip and bruising throughout his body. (Id. 37.) Both Rao and Roberts used compliance holds and strikes with their hands or fists against Mariano. (Ex. E to Pls.' Opp'n Br., Rao UOFR; Ex. H to Pls.' Opp'n Br., Roberts UOFR.)

During the confrontation, Isack was also grabbed by an Officer from behind and slammed against the ground, after which he was kicked, punched and handcuffed. (Ex. C to Pls.' Opp'n Br., Deposition Testimony of Isack Perez ("Isack Dep.") 25:19-26:11.) Rao, Heller, and Roberts all admit to having used compliance holds and strikes with their hands or fists against Isack. (Ex. E to Pls.' Opp'n Br., Rao UOFR; Ex. F to Pls.' Opp'n Br., Officer Heller Use of Force Report; Ex. G to Pls.' Opp'n Br., Roberts UOFR.)

Despite the various forms of force used by the Officers, Plaintiffs claim that none of them ever touched or assaulted the Defendants. (See Ex. D to Defs.' Br., Chiariello Dep. 19:24-20:21 (Chiariello could not recall any opposition from Plaintiffs other than one stiffening his body in resistance to being arrested); Ex. A to Pls.' Opp'n Br., Mariano Dep. 27:12-13 (Mariano did not

touch any of the Defendants); Ex. C to Pls.' Opp'n Br., Isack Dep. 38:14-39:9 (Isack never

resisted, punched, or kicked the Defendants, nor did he take a fighting stance).)

After being placed into custody and at the conclusion of these events, Mario, Isack and

Misael were all taken to Our Lady of Lourdes Hospital for treatment of their injuries.  (Id. ¶ 33.)

At the hospital Misael was diagnosed with a minor head injury, a superficial head injury, and a

face laceration, but he did not suffer any permanent injury.  (Id. ¶¶ 34, 39.)  Isack was diagnosed

with a superficial head injury, multiple abrasions, an unspecified shoulder injury, and an

unspecified contusion, but he also did not suffer any permanent injury.  (Id. ¶¶ 35, 38.)  Mario

received medical treatment from a number of providers from December 25, 2010 through

September 1, 2011.  (Id. ¶ 36.)  When asked about whether he suffered any permanent injury,

Mario referred to a narrative report from his treating physician, Chunyang T. Wang, M.D., which

does not offer any opinion on the permanency of Mario's injuries.  (Id. ¶¶ 40-41.) Mariano was

not in need of medical treatment, was not taken to the hospital and did not suffer a permanent

injury.  (Id. ¶¶ 33, 37.)

On December 18, 2012, Plaintiffs filed suit against Defendants.  (Compl.)  Plaintiffs

bring claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J. Stat. Ann. §§

10:6-1 et seq. (the "NJCRA") against Defendants and John Does 1-20.  Plaintiffs assert § 1983

claims against the Officers for excessive force.  (Compl. Count 1 ¶ 42.)  Plaintiffs also assert a §

1983 claim against Camden City for constitutional deprivations resulting from deliberate

indifference to unlawful customs, practices or policies, and inadequate training, as well as failure

to discipline.  (Compl. Count 1 ¶¶ 44-45).  Plaintiffs assert NJCRA claims against all Defendants

for deprivation of their rights under the Fourth and Fourteenth Amendments to the United States

Constitution, as well as Article 1 of the New Jersey State Constitution (Compl. Count 2 ¶¶ 48-49.)[5]

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

---

[5] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities."  Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court."  Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiffs have failed to amend their Complaint or otherwise identify any of these fictitious defendants despite the fact that discovery has now closed.  Thus, these parties shall be dismissed.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder, not the district court.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   CLAIMS AGAINST THE OFFICERS

As noted above, Plaintiffs bring claims against the Officers for excessive force.  (Compl. Count 1 ¶ 42; Count 2 ¶¶ 48-49.)  Plaintiffs claim that the Officers either "directly subjected [Plaintiffs] to excessive force; or in the alternative failed to intervene while other police officers subjected these men to unnecessary and excessive force."  (Compl. ¶ 34.)  With respect to these

claims, Defendants contend that they are entitled to qualified immunity; they do not advance any alternative arguments.[6]

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223 (2009)).  If a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate.  Id.  "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Id.  "The immunities of municipalities and their officials sued directly under [the New Jersey Constitution] are identical to those provided by federal law."  Lloyd v. Borough of Stone Harbor, 432 A.2d 572, 583 (N.J. Super. Ct. Ch. Div. 1981); see also Ramos v. Flowers, 56 A.3d 869, 882 (N.J. Super. Ct. App. Div. 2012) ("qualified immunity is an affirmative defense under the [NJCRA]"); J.S. v. Lee, No. L-783-10, 2011 WL 1344997, at *3 (N.J. Super. Ct. App. Div. Apr.11, 2011) (applying the federal qualified immunity standard to address both federal section 1983 claims and state constitution claims under NJCRA).

The Supreme Court has established a two-part analysis to determine if qualified immunity is appropriate:  (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was "clearly established" at the time of defendant's

---

[6] Defendant Roberts in part moves for summary judgment against Plaintiffs' "conspiracy claim," but this Court is not aware of such a claim against Defendants.  The language in ¶ 12 of the Complaint cannot be read as properly pleading a claim for conspiracy, nor have Plaintiffs put forth any facts alleging a conspiracy amongst Defendants. Accordingly, the Court will not address Roberts' argument with respect to this claim.

alleged misconduct.  Pearson, 555 U.S. at 232.  Courts are permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first.  Id. at 236.  The right is "clearly established" only if the right was sufficiently

clear such that a reasonable official would understand that what he is doing violates that right.

Ray, 626 F.3d at 174.  Even if the officer made a mistake about the legal constraints on his

actions, as long as the mistake was reasonable, qualified immunity still applies.  Id.  To avoid

hindsight, the officer's actions are judged from the perspective of a reasonable officer under the

circumstances.  Id.

### A.      Claims for Excessive Force Under § 1983 – Count One

Claims that police officers used excessive force in an arrest are analyzed under the Fourth

Amendment objective reasonableness standard.  Graham v. Connor, 490 U.S. 386, 388 (1989).

To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that a

"seizure" occurred and that it was unreasonable.  Curley v. Klem, 499 F.3d 199, 203 (3d Cir.

2007).  The test of Fourth Amendment reasonableness of force used during seizure is whether,

under the totality of the circumstances, an officer's actions are objectively reasonable in light of

facts and circumstances confronting him, without regard to his underlying intent or motivations.

Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.  An excessive force

claim must be evaluated from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004);

Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011) ("Monday morning quarterbacking is

not allowed").

In assessing whether the use of force was objectively reasonable, courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Rivas, 365 F.3d at 198 (quotation marks and citation omitted). Courts may also consider "the possibility that the persons subject to the police action are violent or dangerous . . . the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Kopec, 361 F.3d at 777.

While reasonableness is often a question for the jury, summary judgment in favor of defendants is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Id. (quoting Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999)).

New Jersey courts apply the federal standard when addressing excessive force claims brought under the state constitution. See State v. Ravotto, 777 A.2d 301, 306-307 (N.J. 2001) (applying the federal standard for both the federal and state constitutional claims); see also Watters v. Emery, No. L-19-05, 2008 WL 1820700, at * 3-4 (N.J. Super. Ct. App. Div. Apr. 24, 2008) (same); Norcross v. Town of Hammonton, No. 04-2536, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) (finding that the excessive force standard under the New Jersey constitution is the same as under the federal constitution).

Here, Defendants argue that the Officers are entitled to qualified immunity as to Plaintiffs' excessive force claims because the Officers were performing their duties as law enforcement officers when they developed a reasonable suspicion of wrongdoing by certain

13

Plaintiffs, and each Plaintiff refused to cooperate and physically resisted arrest when the Officers attempted to place them under arrest.  (Defs.' Br. 14.)  Heller's suspicion of wrongdoing was objectively reasonable, according to Defendants, and as such the officers were authorized to use necessary force to arrest Isack and Mariano.  (Id. at 16.)  "As the situation escalated, the amount of force required likewise increased … [t]he officers used the force which, in their judgment, was required."  (Id.)  Defendants further argue that Plaintiffs "showed that they were willing to violently attack the defendant officers," and that "[t]here was no opportunity to check any of the plaintiffs for weapons, and until backup arrived, the officers were vastly outnumbered."  (Id. at 17.)  According to Defendants, "[u]nder those circumstances, the force used was objectively reasonable," and thus did not violate Plaintiffs rights.  (Id.)  Additionally, Defendants argue that because Plaintiffs all fail to specifically identify which of the Officers used the alleged excessive force against each one of them, except for Mariano's claim that Heller hit him and Isack's claim that Rao put him in a headlock, all of these claims should be dismissed.  (Id. at 18-22; Roberts Br. re: Mariano 10-13; Roberts Br. re: Mario 10-12; Roberts Br. re: Isack 10-12; Roberts Br. re: Misael 10-13.)

Plaintiffs contend that there is sufficient conflicting testimony among the parties to create genuine issues of material fact from which a jury could conclude that the Officers acted unreasonably and used excessive force.  (Pls.' Opp'n Br. 24-25.)  The Court agrees.

Turning first to Plaintiffs' excessive force claims, neither party disagrees that the seizure of Plaintiffs occurred.  The remaining question with respect to these claims concerns the reasonableness of that seizure.  Viewing the facts in the light most favorable to Plaintiffs, a

reasonable jury could conclude that the Officers used excessive force during the course of Plaintiffs' arrests.

According to Plaintiffs' version of the events, during the motor vehicle stop Heller was aware that Isack had merely thrown a pack of cigarettes out the window to Mariano. Rather than attempting to stop Mariano from fleeing arrest, Plaintiffs claim Heller actually told Mariano to return to the apartment. Next, the Officers approached the apartment, where Mario and Misael and others were standing at the door, and yelled after Mariano, instructing him to come back outside. Though none of those standing by the door physically resisted the Officers, Misael was hit suddenly in the face by one of the Defendants. At that point both Misael and Mario were dragged away from the apartment and the Officers continued attacking the Plaintiffs and placing them under arrest.

Though Misael is unsure which Defendant hit him first, Heller testified that he was involved with the arrest of Misael. Rao, Roberts and Chiariello all submitted Use of Force Reports which admit to having used force against Misael, and Rao admitted to having used his flashlight to strike Misael.

Mario claims he was pushed forcibly to the ground by one of the Defendants using his feet, even though he was complying fully with the Officers when asked to get on the ground and put his hands behind his back. Despite being compliant, one of the Officers then pushed Mario's hand so far up his back that his shoulder was dislocated. Additionally, Mario claims he was kicked by multiple Defendants while he was on the ground. Both Roberts and Chiariello admit to using compliance holds and their hands or fists to arrest Mario, and Chiariello admits to pushing Mario to the ground in order to keep him from getting up.

One of the Officers rushed Mariano from behind, picked him up, and slammed him to the ground, after which he was kicked and punched.  Mariano claims he never touched the Defendants.  The Officers continued to punch and pick him while he was handcuffed and on the ground.  Mariano remembers Heller and Rao were involved, and that Heller punched him at one point during the arrest.  Both Rao and Roberts admit in their Use of Force Reports to having used compliance holds and strikes with their hands or fists during the arrest of Mariano.

Isack also claims he was grabbed by an unknown Defendant from behind and slammed against the ground.  While on the ground he was kicked, punched and handcuffed.  Rao, Heller and Roberts all admit to using compliance holds and strikes with their hands or fists against Isack.  Despite this use of force by Defendants, Isack testified that he never resisted, punched, kicked, or took a fighting stance towards the Officers.

There is no evidence on the record that the crowd which gathered just before and during the arrests of Plaintiffs actually interfered with the arrests, other than talking or yelling at the Officers from a distance.  Nor is there evidence that Plaintiffs or members of the crowd were armed.  According to Plaintiffs' evidence, none of them assaulted the Officers or resisted arrest at any time.

Accepting this evidence, Mariano was not in fact fleeing arrest at the time Heller told him to go back inside the apartment.  Plaintiffs did not initiate the assault, or resist, other than one suspect possibly stiffening his body, when the Officers began to arrest each of them.  A jury could reasonably conclude that neither the Plaintiffs, nor the crowd, posed a threat to the Officers.  Though none of the Plaintiffs has alleged permanency of their injuries, each has

alleged that they suffered some injuries from the Officers' actions.[7]  If a factfinder were to believe Plaintiffs' version of events, it would be reasonable to conclude that, under these circumstances, punching Misael suddenly, kicking Mario to the ground, slamming both Mariano and Isack to the ground, hitting Misael with a flashlight, kicking and punching Plaintiffs while they were handcuffed and lying on the ground, and using force in a manner sufficient to dislocate Mario's shoulder while he was lying on the ground all constitute the use of excessive force.  See, e.g., Watson v. Haverford Twp. Police Dep't, No. 10-6731, 2012 WL 1900629 (E.D. Pa. May 25, 2012) (holding that based on plaintiff's version of the events, i.e., that the officer put plaintiff "face down on the table and yanked her hands behind her back," plaintiff purportedly told the officer "that he was hurting her, but he did not reply," two officers picked plaintiff up under her arms and dragged her down the driveway to their police car with her feet barely touching the ground, and then screamed in plaintiff's ear and pushed her in the police car, a jury could find that the defendant officers used considerable force in arresting plaintiff); French v. Squire-Tibbs, No. 11-1009, 2013 WL 3283869, at *4 (D.N.J. June 26, 2013) (where there was "no indication, by Plaintiff's account, that he 'actively resist[ed]' the officers when they entered the holding cell to subdue him . . . there was little 'possibility that [he] may [have been] armed,'" and there "was only one potentially dangerous person with whom the officers had to contend" a factfinder could conclude that "the use of a billy club to the face with sufficient force to break a person's orbital bone would constitute excessive force in violation of the Fourth Amendment"); Smith, 293 F.3d

---

[7] While Defendants point to the lack of permanency of Plaintiffs' injuries in their briefs, the Court notes that injuries are only one of the factors that a court considers when determining whether the force used was unreasonable. See Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir. 2002) ("[D]e minimis injuries do not necessarily establish de minimis force.")

at 649 ("Punching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is repugnant to the conscience of mankind, absent the extraordinary circumstances necessary to justify that kind of force.") (internal quotation marks omitted).

The fact that Plaintiffs cannot not each identify which individual Officer tackled, punched or kicked them in every circumstance is not fatal to Plaintiffs' claim either.  Police officers have a duty to act reasonably to protect victims from another officer's use of excessive force.  Id. at 650.  They "[cannot] escape liability by turning a blind eye or deaf ear to the illegal conduct of their colleagues."  Id. at 652.  There is no dispute that all four of the Officers were present during the arrests of the Plaintiffs, each Plaintiff has alleged acts of excessive force committed by at least one of the Officers present, and each Officer admits to using some force to arrest at least one or all of Plaintiffs.  The extent of each Defendant's participation and culpability is a factual dispute to be resolved by the fact finder.  If a jury concluded that even one of the Officers used excessive force against each Plaintiff it could also reasonably conclude that the other officers "knew of and acquiesced in the treatment of the [Plaintiffs]."  Id. at 651 (quoting Baker v. Monroe Township, 50 F.3d 1186, 1193 (3d Cir. 1995)).

Having determined that a reasonable jury could conclude that the Officers violated Plaintiffs' constitutional rights through use of excessive force, the Court turns to the second prong of the qualified immunity analysis—whether Plaintiffs' rights were clearly established and it would be clear to a reasonable officer that his conduct was unlawful under the circumstances.

Based on the foregoing, and viewing the facts in the light most favorable to Plaintiffs, the Court concludes that it cannot be said as a matter of law that a reasonable officer would not have

18

known that pushing on a man's arm until his shoulder dislocated, punching an unsuspecting individual in the face, slamming non-threatening or compliant individuals to the ground from behind, hitting a suspect with a flashlight, and punching and kicking individuals while handcuffed and on the ground, were violations of the Fourth Amendment, especially where Plaintiffs did nothing to provoke the initial physical encounter with the Officers, they did not resist arrest, they were in handcuffs for part of the assault, they were never known to be in possession of or using weapons, and none of the bystanders were actively interfering with the arrests.  See Middleton v. City of Ocean City, No. 12-0605, 2014 WL 2931046, at *11 (D.N.J. June 30, 2014) (holding that an officer should clearly know his use of force was unreasonable where "Plaintiff was fully cooperating with [the officer], informed [the officer] that he was hurting her in the course of her handcuffing and asked to stop, [the officer] testified that he did not have to contend with any other individuals at the time of Plaintiff's arrest, and the offenses at issue were relatively minor, non-violent charges.") (internal citations omitted); Williams v. Twp. of W. Deptford, No. 05-1805, 2008 WL 1809134, at *5 (D.N.J. Apr. 22, 2008) ("This Court concludes that it would have been clear to a reasonable police officer that three male officers lifting a woman in the air and throwing her on the ground with force sufficient to break a femur bone is unreasonable where that individual is alone, unarmed, outnumbered by police eight to one."); Klemash v. Monroe Twp., No. 07-4190, 2010 WL 455263, at *8 (D.N.J. Feb. 4, 2010) (noting that where defendant was told repeatedly that plaintiff was unable to move his arm behind his back, and the offense was minor, it was clear that a reasonable officer would have known his conduct was unlawful under the circumstances).

Accordingly, the Court will deny Defendants' motions for summary judgment on Plaintiffs' excessive force claims against the Officers.[8]

**B.      Claims for Excessive Force Under the New Jersey Civil Rights Act – Count Two**

Plaintiffs also allege that the Officers deprived them of their "Federal and State constitutional rights in violation of the [NJCRA]."  (Compl. Count 2 ¶ 49.)  Count Two incorporates the Fourth Amendment and Fourteenth Amendment violations alleged in Plaintiffs' § 1983 claim, as well as a violation of Plaintiffs "rights and privileges under Article 1 of the New Jersey State Constitution," arising from the same conduct by the Officers.  (Compl. Count 2 ¶ 49.)

In their motions for summary judgment Defendants argue that Plaintiffs' NJCRA claims are subject to the provisions of the New Jersey Tort Claims Act, N.J. Stat. Ann. §§ 59:1-1 et seq. (the "TCA").  Specifically they contend that a plaintiff must "suffer permanent injury or disfigurement and incur medical expenses which exceed $3,600)," and must "provide a tort claim notice as required by N.J.S.A. 59:8-8."  (Defs.' Br. 23.)[9]  The Court notes that New Jersey courts have already determined that claims under the NJCRA are not subject to the TCA's procedural requirements, including its "notice-of-claim" provision.  See Owens v. Feigin, 394 925 A.2d 106 (N.J. Super. Ct. App. Div. 2007), appeal granted 932 A.2d 25, affirmed as modified 947 A.2d 653.  This Court has also held that the TCA is inapplicable to constitutional

---

[8] "Qualified immunity may still be available at trial in light of the jury's findings of facts."  Klemash, 2010 WL 455263, at *8 n.3 (citing Halpin v. Gibson, No. 05-2088, 2009 WL 3271590, at *2-3 (D.N.J. Oct. 9, 2009) (considering a post-trial motion for qualified immunity)).

[9] Roberts only raises the "permanency threshold requirement" argument in his motions for summary judgment.

claims and claims brought under the NJCRA.  See Ingram v. Twp. Of Deptford, 911 F. Supp. 2d 289, 299 (D.N.J. 2012) (holding that the TCA is inapplicable to constitutional claims brought under the NJCRA); Baklayan v. Ortiz, No. 11-3943, 2012 WL 1150842, at *3 n. 3 (D.N.J. Apr. 5, 2012) ("The [TCA] does not apply to statutory claims under the [NJCRA].").  For these reasons the Court rejects Defendants' argument regarding the TCA's "twin bars to recovery." (See Defs.' Reply Br. o/b/o Camden City, Heller, Rao and Chiariello 1.)

Defendants fail to advance any alternative arguments as to why summary judgment is warranted on Plaintiffs' state law claims.[10]  Because Plaintiffs' allegations of excessive force under the federal and New Jersey Constitutions are identical, and federal and New Jersey law governing these violations are substantially similar, the Court's reasoning as to Count One applies here.  See Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011) (interpreting the NJCRA analogously to § 1983); Hedges v. Musco, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding that New Jersey's constitutional provision concerning unreasonable searches and seizures is interpreted analogously to the Fourth Amendment).  Based on the Court's conclusion supra, qualified immunity is not available at this time, and the Court will deny Defendants' motions for summary judgment as to Count Two against the Officers.

## IV.    CLAIMS AGAINST CAMDEN CITY

Plaintiffs allege that Camden City "encouraged, tolerated, ratified and has been deliberately indifferent to … patterns, practices and customs and to the need for more or different

---

[10] Defendants Camden City, Heller, Rao and Chiariello do not put forth any arguments in support of their motion for summary judgment apart from the supposed TCA bars to recovery, discussed infra.  (See Defs.' Br. at 22-23.)  In addition to his "permanency threshold requirement" argument under the TCA, Defendant Roberts also incorporates his arguments for summary judgment against Plaintiffs' federal law claims as to the state law claims.  (See Roberts Br. re: Mario at 16; Roberts Br. re: Mariano at 18; Roberts Br. re: Misael at 17; Roberts Br. re: Isack at 16.)

training, supervision, investigation or discipline," (Compl. Count 1 ¶ 44), and "failed to properly sanction or discipline officers, who were aware of, conceal, and/or aid violations of constitutional rights of citizens by other Camden Police Officers; thereby causing and encouraging Camden police officers, including [the Officers], to violate the rights of citizens." (Id. ¶ 45.)  The result of this conduct was a deprivation of Plaintiffs' rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of § 1983 (Id. ¶ 46.) Additionally, the Plaintiffs' assert an analogous state law claim under the NJCRA for the deprivation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution as well as Article 1 of the New Jersey State Constitution.  (Compl. Count 2 ¶¶ 48-49.)

Defendants fail to move against—or even mention—Plaintiffs' federal and state law claims against Camden City in their motion for summary judgment.  (See Defs.' Br. 11-23.) Accordingly, the Court will not grant summary judgment on Plaintiffs' claims against Camden City in Counts 1 and 2.[11]

---

[11] Rule 56 states that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis added).

**IV.     CONCLUSION**

For the reasons stated above, the Court denies Defendants' motion for summary

judgment as to all Plaintiffs and all claims.  An appropriate order shall issue today.


Dated:  9/22/2014                      s/ Robert B. Kugler
                                                       ROBERT B. KUGLER
                                                       United States District Judge